UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>      Plaintiff-Applicant,<br><br>    -against-<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>      Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>      Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>      Plaintiff,<br><br>    -against-<br><br>JO ANN CRUPI and JUDITH BOWEN,<br><br>      Defendants. | Adv. Pro. No. 10-04216 (SMB) |

**DISCOVERY ARBITRATOR'S SECOND DECISION AND ORDER**

The Trustee has moved to compel the production of documents in the possession of Guston & Guston, a law firm that previously represented defendants Jo Ann Crupi and Judith Bowen (the "Defendants") in connection with a real estate transaction and other matters. For the reasons set forth below, that application is granted in part and denied in part.

I.    Background

By Decision and Order dated December 7, 2016, I directed that Guston & Guston submit to me, for in camera review, certain documents in its possession that the Defendants had withheld from production based on a claim of attorney-client privilege. (See ECF No. 92-2 ("Decision and Order") at 12). I did so after concluding that the Trustee had made an adequate preliminary showing that the crime-fraud exception to the attorney-client privilege might apply to those documents. (Id. at 8-9).

My Decision and Order did not reach the Defendants' contention that Ms. Bowen, who was not implicated in the Madoff fraud, could shield the documents from disclosure even if Ms. Crupi had sought legal advice from Guston & Guston in furtherance of criminal activity. As I explained, there was no need to address that issue unless I determined, after my review, both that the withheld documents were privileged and that the communications at issue were made in furtherance of a scheme or fraud. (Id. at 11-12).

The Defendants' counsel originally produced the Guston & Guston documents identified on the privilege log on December 15, 2016. Thereafter, by email

2

dated January 4, 2017, I advised counsel of certain deficiencies in the Guston & Guston production, which counsel promptly agreed to address.[1] By letter dated January 17, 2017, counsel then produced (a) an annotated privilege log; (b) copies of the documents previously produced (now further identified by exhibit numbers); (c) an additional 43 emails that were not part of the Defendants' original production; and (d) a supplemental privilege log.[2]

Having reviewed the Defendants' latest submission, I find that the Defendants have failed to meet their burden with respect to virtually all of the documents that they allege are privileged. In addition, certain of the documents that are privileged fall within the crime-fraud exception. Accordingly, for the reasons set forth below, the Defendants will be required to produce both these categories of documents to the Trustee.

II.     Discussion

   A.     Attorney-Client Privilege

As explained in the Decision and Order, because the complaint in this adversary proceeding alleges claims for relief under both state and federal law, the applicability of the privilege must be decided based upon the application of federal common law. (Id. at 7 (citing Fitzpatrick v. Am. Int'l Grp., Inc., 272 F.R.D. 100, 104

---

[1]     I did not copy the Trustee's counsel on my email to the Defendants' counsel because the documents had been produced to me, in the first instance, for in camera review.

[2]     Defense counsel correctly concluded that the "annotations and additional emails are substantive," and thus provided the Trustee's counsel with a copy of his January 17 letter, together with the new privilege logs. (See letter to the Discovery Arbitrator from Eric R. Breslin, Esq., dated Jan. 17, 2017, at 2).

3

(S.D.N.Y. 2010)). "The burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it." United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO, 119 F.3d 210, 214 (2d Cir. 1997). Accordingly, the Defendants bear that burden here. To prevail on their privilege claim with respect to a particular document, the Defendants consequently must show that it constituted "(1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice." United States v. Constr. Prods. Res., Inc., 73 F.3d 464, 473 (2d Cir. 1996).

    B.    <u>Non-Privileged Documents</u>

The non-privileged documents that the Defendants have improperly withheld from production fall into a number of broad categories.[3]

First, many of the documents are merely transmittal letters or emails that enclose or attach other documents. These "cover" communications neither furnish nor request legal advice and do not reveal any privileged communications. These documents consequently cannot be withheld from discovery merely because they were sent to or from counsel. See, e.g., P&B Marina, Ltd. P'ship v. Logrande, 136 F.R.D. 50, 54

---

[3] Many of these non-privileged documents are emails that appear repetitively in email chains. For that reason, I have not attempted to list each non-privileged document or communication by Bates number. Suffice it to say, any documents on the Defendants' privilege logs that have not specifically been identified as privileged in this Second Decision and Order must be produced.

4

(E.D.N.Y. 1991) ("[T]ransmittal letters or acknowledgements of receipt that do not include legal advice []or disclose privileged matters are not subject to the attorney-client privilege.").

Second, there are drafts (or portions of drafts) of documents intended to be shared with the seller's counsel and communications between Guston & Guston and the Defendants concerning those drafts. Although some of these draft documents may never have been revealed to the seller, it is clear that any advice from counsel that may have been sought or given with respect to these documents related to business strategy, rather than legal issues. These documents therefore also must be produced. See TVT Records v. Island Def Jam Music Grp., 214 F.R.D. 143, 144 (S.D.N.Y. 2003) ("[O]nly those communications related to legal, as contrasted with business, advice are protected.") (internal quotation marks omitted)

Third, there are numerous documents related to the Defendants' desire to take possession of the Mantoloking house before the actual closing date pursuant to a use and occupancy agreement. Once again, these documents, which were ultimately intended for the seller's review and signature, were not intended to be confidential. Accordingly, these documents must be produced.

Fourth, there are documents relating to such routine business issues as the progress of the transaction, the procurement of flood insurance, the escrowing of funds, and the proposed closing date. These business-oriented communications obviously were not intended to be kept confidential. Indeed, virtually by definition, they were meant to

5

be conveyed to third parties, such as insurance brokers, the seller of the property, and the seller's counsel. The privilege is therefore inapplicable to these documents.

Fifth, the materials include the first page of a draft "RESPA" statement. Congress enacted the Real Estate Settlement Procedures Act of 1974 in an effort to "protect consumers from 'abusive practices' that result in 'unnecessarily high settlement charges.'" Cohen v. J.P. Morgan Chase & Co., 498 F.3d 111, 122 (2d Cir. 2007) (citing 12 U.S.C. § 2601(a)). The furnishing of an estimate of the amount of cash required to close the transaction in no way conveys any legal advice, nor does it reveal any information that the Defendants have shown was intended to be kept confidential. Indeed, the Defendants themselves make the point that the monetary details of the transaction have been fully disclosed to the Trustee. (See letter to the Discovery Arbitrator from Eric R. Breslin, Esq., dated Nov. 18, 2016 ("Breslin Nov. Ltr."), at 3). There consequently is no basis for asserting privilege with respect to this document.

Sixth, there are materials related to the legal fees that the Defendants' counsel charged for their services in connection with the acquisition of the Mantoloking house and an estate planning issue. It is, however, black letter law that "[a]ttorneys' bills and communications regarding retainer agreements are not privileged." Duttle v. Bandler & Kass, 127 F.R.D. 46, 52 (S.D.N.Y. 1989). The Trustee is therefore entitled to this information.

Finally, there are documents relating to the Defendants' desire to modify the form of the purchase transaction. Records that the Trustee already has obtained make

6

clear that both Defendants were originally intended to be the purchasers of the house. Later, however, the transaction was restructured so that only Ms. Bowen was the purchaser. Even if the discussions that the defendants had with their counsel regarding this change arguably are privileged, the routine business measures that were required to accomplish it plainly are not. Accordingly, those documents must be produced.

### C.  Privileged Documents

Notwithstanding the Defendants' astonishingly overbroad privilege assertions, there are certain limited documents that do, in fact, appear to reflect privileged communications. These documents are described only generally in the Defendants' privilege logs as "reflecting communications regarding real estate transactions." Bankruptcy Rule 7026 provides, however, that Rule 26 of the Federal Rules of Civil Procedure applies in adversary proceedings such as this one. See B. R. 7026. Rule 26, in turn, requires that a party seeking to rely on the attorney-client privilege "describe the nature of the documents, communications, or tangible things not produced or disclosed . . . in a manner that, without revealing information itself privileged . . . , will enable other parties to assess [the applicability of the privilege.]" Fed. R. Civ. P. 26(b)(5)(A)(ii). Here, the single description used for almost all of the documents listed in the privilege logs is so generic as to be useless. I consequently have described the privileged documents in somewhat greater detail in this Second Decision and Order so that the Trustee and the Defendants will both be able to understand the bases for my rulings. I

also have identified these documents by Bates numbers so that there will be no ambiguity concerning the documents that may be withheld.

The privileged documents fall into three categories.

First, there are documents that relate to the Defendants' desire to name guardians to care for their minor children in the event that they both died before their children reached the age of majority.[4] Such estate planning-related communications are unquestionably privileged. See, e.g., Bria v. United States, No. 3:01MC (CFD), 2002 WL 663862, at *6 (D. Conn. Mar. 26, 2002) (letter "contain[ing] tax advice concerning estate administration matters . . . is protected by the attorney-client privilege"). It is unclear why the Defendants listed these documents on their privilege log since they do not relate to the real estate transaction and related money transfers that were the sole subjects of the Trustee's subpoena. (See ECF No. 85 at 29). In fact, all of these documents were created in 2015, more than five years after the "Relevant Time Period" (April 1, 2008, through February 29, 2009) defined in the subpoena. (See id. at 23). In any event, even if the documents were responsive to the subpoena, in a footnote to the letter-application seeking production of the Guston & Guston documents, the Trustee makes clear that he does not challenge the Defendants' assertion of privilege as to these documents. (See letter to the Discovery Arbitrator from Terry M. Brennan, Esq., dated

---

[4]    These documents are Bates numbered GG-ARCHIVE-000150-206

Nov. 11, 2016 ("Brennan Ltr."), at 6 n.4). The guardianship-related documents therefore need not be produced.

Second, there are documents relating to the Defendants' potential establishment of a family limited partnership ("FLP") [5] to take title to the Mantoloking house.[6] Eventually, the Defendants decided instead to have Ms. Bowen be the sole purchaser. In their letter opposing the production of these documents, the Defendants suggest that they had been exploring acquiring the house through an FLP so that Ms. Crupi, the "family breadwinner," could give Ms. Bowen, her life partner, "a small piece of the security usually afforded a wife in a 'traditional' marriage." [7] (See Breslin Nov. Ltr. at 3). Like the guardianship documents, the documents relating to the potential use of an FLP are estate planning documents which were created for the purpose of seeking or rendering legal advice and were intended to be confidential. These documents consequently are privileged. E.g., Bria, 2002 WL 663862, at *6.

Third, there is an email that relates, in part, to the use and occupancy agreement. (GG-ARCHIVE000069). This document renders legal advice concerning the

---

[5] An FLP is a vehicle by which taxpayers may seek to "transfer property to family members with a minimum of Federal estate tax consequences." Freedman v. Freedman, 834 N.E.2d 251, 253 (2005) (citing Estate of Strangi v. Comm'r, 85 T.C.M. (CCH) 1331, 2003 WL 21166046, aff'd, 417 F.3d 468 (5th Cir. 2005)).

[6] These documents are Bates numbered GG-ARCHIVE 000054, 55, 65, 67, and 71-75.

[7] The Defendants evidently were married in Massachusetts in 2009 after the Massachusetts Supreme Judicial Court declared that state's restrictions on same-sex marriage violative of the Massachusetts constitution. See Goodridge v. Dep't of Public Health, 440 Mass. 309, 798 N.E.2d 941 (2003).

9

Defendants' potential exposure if they failed to purchase the house despite having taken occupancy. From the face of the document, it seems clear that the advice rendered by counsel was intended to be confidential. The portion of the email concerning this advice therefore falls squarely within the attorney-client privilege.

### D.    Crime-Fraud Exception

The Trustee maintains that every communication between the Defendants and Guston & Guston relating to the purchase of the Mantoloking house falls within the crime-fraud exception to attorney-client privilege because the Defendants were using that firm's services to advance the BLMIS fraud and shield the proceeds of that fraud from creditors. (See Breslin Nov. Ltr. at 8 & n.5). To assess the merits of that contention, I first must consider the degree of proof necessary for the Trustee to establish that the documents are subject to production under the crime-fraud exception.

#### 1.    Applicable Standard

The Supreme Court has expressly avoided weighing in on "the quantum of proof necessary ultimately to establish the applicability of the crime-fraud exception." See United States v. Zolin, 491 U.S. 554, 563 & n.7 (1989). In this Circuit, however, it is clear that a party seeking to invoke the crime-fraud exception must "at least demonstrate that there is probable cause to believe that a crime or fraud has been attempted or committed and that the communications were in furtherance thereof." In re Richard Roe, Inc., 68 F.3d 38, 40 (2d Cir. 1995) ("Roe I") (emphasis added) (citing In re John Doe, Inc., 13 F.3d 633, 637 (2d Cir. 1994)); accord United States v. Jacobs, 117 F.3d 82, 87

10

(1997). As Magistrate Judge Dolinger has noted, the Second Circuit has never expressly indicated how this probable cause standard should be applied in a civil proceeding. See In re Omnicom Grp. Inc. Secs. Litig., No. 02 Civ. 4483, 2007 WL 2376170, at *9-10 (S.D.N.Y. Aug. 10, 2007) (Omnicom II). Nonetheless, the use of the "at least" language in Roe I suggests that courts have the discretion to require a standard of proof higher than probable cause. Id.

Courts in other jurisdictions have described a requesting party's burden in different terms. For example, some courts have suggested (at least in the context of grand jury proceedings) that the requesting party need only make a prima facie showing. See, e.g., In re Grand Jury Investigation, 842 F.2d 1223, 1226 (11th Cir. 1988). By comparison, the Ninth Circuit has phrased the appropriate standard of proof as a "preponderance of the evidence test." In re Napster, 479 F.3d 1078, 1093 (9th Cir. 2007), abrogated in part on other grounds by Mohawk Indus., Inc. v. Carpenter, 558 U.S. 100 (2009); see also Zolin, 491 U.S. at 572 (noting that a "lesser evidentiary showing is needed to trigger in camera review than is required ultimately to overcome the privilege"). Indeed, requiring that the showing be made by a preponderance of the evidence is consistent with the procedure under Rule 104 of the Federal Rules of Evidence, which provides that preliminary questions regarding the existence of a privilege are to be decided by the court using that standard. See Fed. R. Civ. P. 104(a); Bourjaily v. United States, 483 U.S. 171, 175 (1987).

11

Faced with this smorgasbord of competing views, Magistrate Judge Dolinger concluded in Omnicom II that in a civil case such as this one, in which the person asserting the privilege opposes the application to compel production, the test should be "whether there is substantial reason to believe that [she] engaged in or attempted to commit a fraud and used communications with [her] attorney to do so." Omnicom II, 2007 WL 2376270, at *11 (emphasis added). This is the test I choose to apply in this proceeding. I note that "the fraudulent nature of the objective need not be established definitively; there need only be a reasonable basis for believing that the objective was fraudulent." In re Grand Jury Subpoena dated Sept. 15, 1983, 731 F.2d 1032, 1029 (2d Cir. 1984). This is "not an overly demanding standard." See Amusement Indus., Inc. v. Stern, 293 F.R.D. 420, 427 (S.D.N.Y. 2013) (quoting A.I.A. Holdings, S.A. v. Lehman Bros., Inc., No. 97 Civ. 4978 (LMM) (HBP), 1999 WL 61442, at *5 (S.D.N.Y. 1999)).

2. Application of the Standard to the Facts

a. Did Ms. Crupi used Guston & Guston to Perpetrate a Fraud?

In their papers opposing the Trustee's application, the Defendants concede that there was a fraud at BLMIS. The Defendants nevertheless vigorously deny that any of Ms. Crupi's dealings with Guston & Guston were in furtherance of that scheme or any other fraudulent conduct. Before production of the challenged withheld documents can be compelled, there consequently must be a showing not merely that BLMIS was a Ponzi

scheme, but that Ms. Crupi communicated with her counsel in furtherance of that scheme or some other fraud.

As noted in my earlier Decision and Order, the mere "temporal proximity between Ms. Crupi's undisputed knowledge that BLMIS's financial position was poor and the Defendants' [ultimate] decision to purchase the Mantoloking house solely in Ms. Bowen's name, rather than jointly as originally planned," suggests that the desire to remove Ms. Crupi from the chain of title was an outgrowth of Ms. Crupi's knowledge that the Madoff Ponzi scheme was about to fall apart. (Decision and Order at 9). The fact that Ms. Crupi originally transferred to Guston & Guston more money than was necessary to purchase the house is also suspicious. (See id. (noting that several factors gave rise to a "reasonable suspicion" that the change in the structure of the transaction and the Defendants' communications with Guston & Guston concerning that change "were in furtherance of ongoing criminal activity"). Mere suspicion, however, is not enough to warrant invading the attorney-client privilege. See In re Omnicom Grp. Inc. Secs. Litig., 233 F.R.D. 400, 404 (S.D.N.Y. 2006) (movant's "burden is not satisfied by a showing that the material in question 'might provide evidence of a crime or fraud'") (quoting In re Richard Roe, Inc., 168 F.3d 69, 71 (2d Cir. 1999) ("Roe II"). Rather, to secure the privileged documents he seeks, the Trustee bears the burden of showing that the crime-fraud exception is, in fact, applicable. Id.

As a consequence, the Defendants had no obligation to provide any proof regarding their motive for restructuring the house purchase as part of their papers

13

opposing the Trustee's application. Nevertheless, in an effort to avoid production of any of the documents as to which the Defendants claim privilege, their counsel has suggested that Ms. Crupi was removed from the chain of title simply to ensure that Ms. Bowen would have some of the benefits that would ordinarily accrue to the surviving spouse in a non-same-sex marriage. (Breslin Nov. Ltr. at 3). Having proffered that explanation, they necessarily have subjected it to scrutiny.

In that regard, I note that the explanation of the Defendants' purported motive appears only in their attorney's letter to the Discovery Arbitrator, not in an affidavit or declaration by either of them. Moreover, as noted in my prior Decision and Order, the suggestion that the Defendants needed to shift ownership to Ms. Bowen to protect her in the event Ms. Crupi died first is belied by the availability of joint tenancies under New Jersey law. By purchasing the property as joint tenants, the Defendants easily could have ensured that Ms. Bowen would be adequately protected in the event Ms. Crupi died first. (See Decision and Order at 8 (quoting Gauger v. Gauger, 376 A.2d 523, 542 (Sup. Ct. 1977) ("[U]pon creation of a joint tenancy, a joint tenant acquires a right of survivorship and, when the cotenant dies, the survivor is seized of the fee to the entire property by virtue of the original grant.")). Their failure to take title as joint tenants therefore casts doubt on their proffered rationale. Indeed, the decision to exclude Ms. Crupi from the chain of title could well have complicated the Defendants' estate issues if Ms. Bowen were the first to die.

14

More importantly, the documents that I have examined in camera make clear that it was Ms. Crupi who was spearheading the effort to ensure that "her name" did not appear on the title to the Mantoloking property. (See GG-ARCHIVE-000074). She further was seeking to do so only a few months before Madoff's Ponzi scheme was exposed. The fact that Ms. Crupi, in particular, was determined to remove any link between her and the house at that critical stage, even though she and Ms. Bowen had intended to take title as joint tenants only a few months earlier, strongly suggests that she was using Guston & Guston to further the goal of removing the funds used to purchase the house from the reach of BLMIS's creditors. Indeed, although the language used by Ms. Bowen in an email to describe Ms. Crupi's intent is admittedly also susceptible to an innocent explanation, the more logical inference is that Ms. Crupi simply wanted there to be no continuing financial connection between her and the house for reasons utterly unrelated to estate planning.

Furthermore, even if Ms. Crupi had no inkling that Madoff was engaged in a Ponzi scheme prior to his arrest, it apparently is undisputed that she transferred nearly $3 million from BLMIS's general account without any corresponding setoff to her own BLMIS investment advisory accounts or indication that the money was due to her as salary or other compensation for her work. The accounting records further show that the excess funds not needed for the house purchase were subsequently transferred back to the Defendants' investment advisory accounts, from which Ms. Bowen later withdrew nearly $750,000 only a month or so before BLMIS collapsed. As the Trustee accurately

15

observes, these intentional actions to hinder, delay, or defraud BLMIS's creditors arguably constitute fraudulent transfers under the Bankruptcy Code, 11 U.S.C. §548(a), which are themselves sufficient to trigger the crime-fraud exception. (See Brennan Ltr. at 8 n.5) (citing Cendant Corp. v. Shelton, 246 F.R.D. 401, 405 (D. Conn. 2007); see also N.Y. Debt. & Cred. Law § 276 ("Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.")).

In sum, there is substantial reason to believe that Ms. Crupi committed (or attempted to commit) a fraud on BLMIS's creditors in connection with the purchase of the Mantoloking house. The Trustee therefore has satisfied the first element of the crime-fraud exception with respect to the documents concerning that transaction.

b. Did the Privileged Communications Further the Fraud?

Turning to the second showing required to invoke the crime-fraud exception, the Trustee need not establish that Guston & Guston had any knowledge of either Madoff's scheme or the bookkeeping legerdemain that led to the transfer of the funds that the Defendants used to purchase the house. See Amusement Indus., 293 F.R.D. at 60 (collecting cases). Nevertheless, the Trustee must show that the Defendants' communications with Guston & Guston furthered the fraud. Jacobs, 117 F.3d 88 (quoting United States v. White, 887 F.2d 267, 271 (D.C. Cir. 1989)) ("It does not suffice that the communications may be related to a crime. To subject the attorney-

16

client communications to disclosure, <u>they must actually have been made with an intent to further an unlawful act</u>.") (emphasis in original). Here, there can be no doubt that the documents relating to the Defendants' efforts to remove Ms. Crupi from the chain of title – through either the use of an FLP or an outright transfer of the house to Ms. Bowen – furthered the unlawful goal of making it more difficult for BLMIS's creditors to trace the funds used to purchase the house and secure their return. The second element of the crime-fraud exception is therefore established with respect to any communications between the Defendants and Guston & Guston concerning the Defendants' efforts to take title to the house in the name of someone other than Ms. Crupi.

In addition to the documents reflecting those communications, the Defendants have produced for <u>in camera</u> review an email in which Guston & Guston provided legal advice regarding the Defendants' rights in the event they occupied the house pursuant to a use and occupancy agreement, but later failed to purchase it. (GG-ARCHIVE000069). It was the purchase of the house, not its rental on an interim basis, that furthered the fraudulent goal of insulating millions of dollars of BLMIS funds from BLMIS's creditors. For this reason, the Trustee cannot show that this communication relating to the rental of the property furthered the Defendants' fraud. The Defendants therefore need not turn over the privileged last full paragraph of this email.

E.  <u>Ms. Bowen's Standing to Object</u>

I previously declined to decide whether Ms. Bowen could block the disclosure of documents reflecting the Defendants' joint communications with Guston &

17

Guston concerning who should purchase the Mantoloking house, even if Ms. Crupi's conduct would otherwise enable the Trustee to compel their production pursuant to the crime-fraud exception. (See Decision & Order at 11-12). Indeed, I noted that the Second Circuit had characterized the rights of an innocent privilege-holder as a "very difficult issue." (See id. at 11) (citing Roe I, 68 F.3d at 41). In light of my ruling that the Trustee has established the applicability of the crime-fraud exception to certain of the documents for which privilege is claimed, I now must reach that question. .

It is black-letter law that when two or more clients are jointly represented by a single law firm concerning a matter of common interest, one of them cannot unilaterally waive the privilege that attaches to communications that they jointly made for the purpose of seeking legal advice. See Lugosch v. Congel, 219 F.R.D. 220, 238 (N.D.N.Y. 2003) ("The essential benefit of such a joint collaboration . . . is that a member of the common legal enterprise cannot reveal the contents of the shared communications without the consent of all the parties."); Johnson Matthey, Inc. v. Research Corp., No. 01 Civ. 8115 (MBM) (FM), 2002 WL 1728566, at *6 (S.D.N.Y. July 24, 2002) (noting that this "common interest extension" of attorney-client privilege affords two parties with a common legal interest a safe harbor in which they can openly share privileged information without risking its wider dissemination). Analogizing her situation to that of a joint defense privilege holder, Ms. Bowen argues that "an innocent, independent party's privilege should not be broken by the actions of a joint privilege holder." (Breslin Nov. Ltr. at 5).

Notably, the crime-fraud exception does not rest on the principle that a client who seeks advice in furtherance of a planned or ongoing fraud thereby waives the right to rely on the attorney-client privilege. Instead, the crime-fraud exception arises out of the judiciary's recognition that the attorney-client privilege exists so that clients may confidentially seek "sound legal advice." In re Grand Jury Subpoena dated Sept. 15, 1983, 731 F.2d at 1038. As the Second Circuit has observed, "advice in furtherance of a fraudulent or unlawful goal cannot be considered 'sound.'" Id. Rather, such advice is "socially perverse." Id. It follows that courts should not extend the protections of the attorney-client privilege to such advice.

Indeed, in Duttle, Magistrate Judge Francis went so far as to conclude, based upon the decision in In re Grand Jury Subpoena, that "legal advice that furthers a fraudulent goal is not privileged, regardless of the innocence of the client seeking the advice." 127 F.R.D. at 56 (emphasis added). This also appears to have been the conclusion of the district judge who considered the alleged rights of the innocent joint privilege holder following the Roe I remand. See In re Richard Roe, Inc., 168 F.R.D. 69, 70 (2d Cir. 1999) (reversing the district court on other grounds).

From the foregoing, is seems apparent that the issue in this proceeding is not one of waiver. There is, in fact, no suggestion that either Ms. Crupi or Ms. Bowen has been asked to waive her privilege with respect to the Guston & Guston documents. Nonetheless, because the Trustee has established that there is substantial reason to believe that Ms. Crupi was seeking advice from Guston & Guston in furtherance of actual

19

or planned fraudulent activity, the Trustee is entitled to the production of the documents that would otherwise be privileged concerning the Defendants' purchase of the Mantoloking house. That Ms. Bowen may not have been involved in the fraudulent scheme does not alter this result.

III.   Conclusion.

For the foregoing reasons, the Trustee's letter-application to compel is granted in part and denied in part, and the Defendants are ordered to produce, within ten days, the non-privileged documents identified in this Second Decision and Order and the documents Bates numbered GG-ARCHIVE000054, 55, 67, and 71-75.

SO ORDERED.

Dated:    February 17, 2017
          New York, New York

_____
FRANK MAAS
Discovery Arbitrator

Copies to:

Counsel of Record   (via ECF)

Debra Guston, Esq.  (via email)
Guston & Guston, LLP